UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA       )
                                       )
           v.                        )   No. 14 CR 319-2
                                       )   Judge John W. Darrah
KE GU                            )

## DEFENDANT KE GU'S SENTENCING MEMORANDUM

Defendant Ke Gu, through his counsel, Francis C. Lipuma, herein submits to this Honorable Court his Sentencing Memorandum through which he presents his positions on issues related to the determination of a fair and reasonable sentence. For the reasons set forth below, Mr. Gu respectfully requests the Court to impose a sentence of probation, pursuant to the factors identified in 18 U.S.C. § 3553(a). It is respectfully submitted that a term of probation along with the restitution order and specially-imposed conditions of probation appropriately recognize Mr. Gu's history and characteristics, the nature and circumstances of the offense, and the need to "impose a sentence sufficient, but not greater than necessary," to be consistent with the purposes of sentencing. *See* 18 U.S.C. § 3553(a).

This memorandum consists of four sections. First, Mr. Gu raises an objection to the calculated infringement amount proposed within the Presentence Investigation Report ("PSR"), and presents argument on the proper calculation of that amount as well as the restitution amount. Second, relevant information is addressed regarding Mr. Gu's personal history and current circumstances. Third, Mr. Gu's criminal conduct is discussed in relation to the nature and circumstances of the offense. Fourth, the most prominent facts and statutory factors are applied to settled legal principles

in support of a variance or departure from the proposed advisory sentencing range to a term of probation.[1]

I. Sentencing Guidelines Calculations

Mr. Gu agrees with the probation office's calculations under the Sentencing Guidelines with the exception of the infringement amount determination. Mr. Gu herein presents his argument that the infringement amount is less than the office's suggested figure of $1,084,199, (PSR at 9, par. 28), and is more accurately calculated when characterized – under the unique facts of this case – as a gain to the defendant in the amount of $35,000. Alternatively, applying the office's methodology of the lowest valued product sold ($89.99) multiplied by the agreed-upon products distributed by Mr. Gu (6,962), the alternative infringement amount is $626,510.

When the government submitted its version of the offense it claimed that a "conservative" infringement amount was approximately $2.05 million. (PSR at 7, par. 15; *see* Attachment to PSR dated March 4, 2016). Mr. Gu challenged the government's estimated infringement amount in written arguments presented to the probation office. (PSR at 7-9, pars. 17-19, 26-27; *see* Attachment to PSR dated April 25, 2016). The probation office thereafter observed that Mr. Gu copied and mailed approximately 6,962 discs, while co-defendant Jun Xu's websites sold approximately 27,000 products. These facts indicated that the bulk of the products were downloaded directly by customers through co-defendant Xu's efforts, and that only approximately one-quarter of the customers requested physical discs. (PSR at 6, pars. 13, 15). The office determined that the infringement

_____

[1]The probation office determined that the total offense level is 19, the criminal history category is I, and the resulting advisory sentencing range is 30-37 months. (PSR at 21, par. 87). However, that office and the parties agree that the statutorily authorized maximum sentence is one year imprisonment, and consequently the guideline term of imprisonment is 12 months, pursuant to USSG § 5G1.1(a). (*Id.*).

amount was $1,084,199, holding Mr. Gu responsible for electronic product distributions he had absolutely no involvement with on the basis of a perceived reasonable foreseeability analysis. (PSR at 9, par. 28). Specifically, the office determined to hold Mr. Gu accountable for 12,048 products multiplied by the lowest valued product sold, that is, $89.99. (PSR at 9, par. 28). Based on these calculations, the office determined that 14 levels should be added to the base offense level of 8. (PSR at 10, par. 28).[2]

While we agree with the probation office in its use of the $89.99 figure given certain of the arguments we raised, we respectfully disagree with (1) the rejection of the gain-based figure of $35,000, and, alternatively, (2) the suggestion that Mr. Gu should be held liable for 12,048 products rather than 6,962 products. If the Court accepts the gain-based method and determines that the infringement amount is $35,000, then there would be a 4 level increase to the offense level. USSG § 2B1.1(b)(1)(C). Alternatively, if the Court accepts our alternate calculation that the infringement amount is $626,510, then there would be a 14 level increase to the offense level, USSG § 2B1.1(b)(1)(H), which produces the same increase as suggested by the probation office, despite the vastly different monetary figures.

A. The Infringement Amount

The subject guideline requires a determination of retail value as the pivotal inquiry focuses on the infringement amount. The term "retail value" is defined as follows: "[T]he 'retail value' of an infringed item or an infringing item is the retail price of that item in the market in which it is sold." USSG § 2B5.3, comment. (n. 2(C)). Further, as there was more than one type of software

_____

[2]After the probation office distributed the PSR, the government submitted a revised estimate of the infringement amount of $1,762,856 – thereby reducing their originally claimed "conservative" amount by nearly $300,000.

infringed here, "the infringement amount is the sum of all calculations made for those items under subdivisions (A) and (B) of this Application Note." USSG § 2B5.3, comment. (n. 2(D)).

Note 2 applies to the determination of the infringement amount, which amount may be calculated in alternate ways. First, the Court may consider the principle that the infringement amount is the retail value of the infringed item multiplied by the number of infringing items. USSG § 2B5.3, comment. (n. 2(A)). For this method of determining the infringement amount, however, at least one of the listed conditions must be established. As reflected in our written arguments in the attachment to the PSR, it is our position that none of the conditions have been established.

Importantly, as explained below, the voluminous Excel spreadsheets and methodology prepared by the Microsoft Corporation suffer from some very serious deficiencies in regards to accuracy. In fact, based on the materials presented by the corporation, it actually is impossible to determine the retail value of the infringed items because there are multiple inherent errors in the materials submitted. Indeed, the corporation provided the probation office with an inaccurate assessment of the actual pecuniary harm it suffered. As a consequence, the corporation's submission should be rejected as a basis for determining the infringement amount.

Second, the Court may consider the principle that the infringement amount is the retail value of the infringing item multiplied by the number of infringing items "in any case not covered by subdivision (A) of the Application Note[.]" USSG § 2B5.3, comment. (n. 2(B)). Commentary to this guideline provision teaches that the Sentencing Commission "determined that use of the retail value of the infringed item would overstate the pecuniary harm or otherwise be inappropriate. In these type of cases, use of the retail value of the infringing item, multiplied by the number of those items, is a more reasonable estimate of the resulting pecuniary harm." USSG § 2B5.3, comment. (backg'd).

While this approach is more reasonable given the facts presented, it likewise fails to accurately account for the true infringement amount. Again, the flaws inherent in the corporation's proposed methodology make this approach impossible to determine. The parties agreed in the plea agreement that "[f]rom on or about August 25, 2010 to on or about August 29, 2011, defendant knowingly infringed the copyrights of Microsoft copyrighted works by copying and distributing approximately 6,962 Microsoft software products." (Doc. 45 at 5). At most, Mr. Gu should be held responsible for the mailings from his home, but, of course, we still are faced with the deficiencies in the materials submitted by the corporation.

We respectfully submit that the Court should not rely on the voluminous electronic spreadsheets provided by the Microsoft Corporation to the government for a number of reasons. Remarkably, the documents initially submitted by the corporation and the government as "conservative" estimates actually were marked in "Draft" form, which hardly inspired confidence in the accuracy and reliability of the methodologies employed as well as the figures presented. Subsequently, the corporation merely deleted the word "Draft" after the defense objected.

Additionally, the corporation's revised submission provides no title, no attribution, no identification of authorship or responsibility for the task or contact information to inquire about the validity of the figures. There is no attempt to summarize the processes employed in connection with the raw data. Essentially, the corporation simply pulled data from the co-defendant's credit card transactions, but provided no showing to tie the transactions made by the co-defendant to his websites, let alone to Mr. Gu and the scope of his agreement with the co-defendant.

The one-page methodology used by the Microsoft Corporation for both websites is identical. They consist of 14 simple points. Importantly, the corporation decided on its own to not confirm the

precise product that was sold with the precise figure that the product was sold for. The corporation admitted this flaw in its methodology: "4. Matching the exact item sold to the credit card transaction listed was going to be a major undertaking that would require countless man hrs. [sic] For this reason, it was decided to match a credit card transaction with items sold at the [PCDeal4U / Elecsurf] website of the same amount." (Methodology at 4).

Clearly, the corporation did not even endeavor to match the infringing item with the infringement amount; rather, the corporation engaged in conjecture in loosely associating a purchase price with a product that was similar to that price. That is, the corporation conceded that it did not match a specific credit card transaction with the specific infringing item sold. Thus, the co-defendant's unrelated transactions were attributed to Mr. Gu in the absence of any connection whatsoever. Moreover, the corporation did not account for chargebacks or reversals for customers who complained and disputed the transactions. For these reasons alone, the corporation's methodology should be rejected as a basis of determining retail value and the infringement amount.[3]

Still, there is another problem with the methodology employed. The corporation asserted: "5. To determined [sic] the retail price of the Microsoft software advertised on the [PCDeal4U / Elecsurf] website, a search for this software was made on the official Microsoft website and the prices listed there as of 12/22/2015 were used." (Methodology at 5). Of course, the prices of the various products did not remain constant over time; they changed as a result of promotions and sales as well as when newer versions were produced or other changes were made. The corporation did not

---

[3]The probation office recognized this flaw in the corporation's methodology, and proposed that applying the lowest priced figure to the number of items would cure the deficiency. We agree, in part, with the probation office that application of the $89.99 figure resolves this particular problem inherent in the corporation's methodology.

account for these obvious variables between 2010 and 2015, and thus there can be no confidence in application of such a methodology. This sort of formula runs contrary to accepted notions of statistics, is inconsistent with the corporation's claim that they used the most conservative formula to determine loss, and is not grounded in the principles of law set forth in the guidelines.

The government bears the burden of proving the infringement amount by a preponderance of the evidence. *United States v. Pu*, 814 F.3d 818, 825 (7th Cir. 2016) (vacating sentence where sentencing court miscalculated loss amount and restitution amount). The government has not carried its burden of proof in this instance because it has relied on the Microsoft Corporation's deficient submission. Indeed, courts in this circuit have rejected government projections of the infringement amount of copyrighted software using methodologies less tenuous than those presented here.

For instance, in *United States v. Slater*, Judge Matthew Kennelly sentenced defendants who were members of an organization called "Pirates With Attitudes" ("PWA"), a group dedicated to the unauthorized dissemination of copyrighted software over the Internet. 348 F.3d 666, 667 (7th Cir. 2003). The government urged the court to calculate the infringement amount based on all of the copyrighted software uploaded to the PWA's Sentinel site as well as each copy downloaded from that site for the entire period of time charged in the indictment. *Id*. at 668. Alternatively, the FBI took a more conservative approach in its calculation of the infringement amount, using a reduced estimate of programs that reflected only the number of functioning uploads and did not include the number of programs downloaded from the site. *Id*. Judge Kennelly rejected both the government's and the FBI's methodologies as over-inclusive because they used questionable and untested theories in arriving at the figures. Instead, the court used an even more conservative approach based on the number of functioning and distinct titles actually on the Sentinel site. *Id*.

Here, similarly, the corporation did not submit a methodology consistent with the Sentencing Guidelines' principles in mind. Thus, the retail values of neither the infringed programs nor the infringing programs can be used because of the deficiencies in the methodology employed. The corporation cannot benefit through such a windfall. This is particularly so where, during the time period of Mr. Gu's involvement in the offense, the corporation reported record revenue of $69.94 billion. (Microsoft Corporation Press Release, dated July 21, 2011). "2011 was actually the year that Microsoft reported its most successful fiscal year to date, with a net income of 23.15 billion U.S. dollars." (www.statista.com/statistics/267808/net-income-of-microsoft-since-2002).

Further, it is fundamental that one participant in a multi-participant scheme may be held accountable, for sentencing purposes, for a greater or lesser amount than other co-participants. The commentary to §1B1.3 provides guidance on this point, observing that the scope of a defendant's criminal activity "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." USSG §1B1.3, comment. (n. 2). A sentencing court must determine "the scope of the criminal activity a particular defendant agreed to jointly undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement)." *Id*.

Importantly, the commentary expresses the Sentencing Commission's view that "the fact that the defendant is aware of the scope of the overall operation is not enough to hold him accountable for the activities of the whole operation." *United States v. Studley*, 47 F.3d 569, 575 (2d Cir. 1995). Instead, a sentencing court must assess and determine the "role the defendant agreed to play in the operation." *Id*. Here, Mr. Gu worked for the co-defendant copying and mailing discs to certain customers as part of PCDeal4U. The scope of his agreement with the co-defendant was so limited.

To the extent the probation office credited aspects of the Microsoft Corporation's "loss" theory, we respectfully submit that sentencing determinations be based on accurate, reliable, and trustworthy information. *United States v. Henderson*, 58 F.3d 1145, 1152 (7th Cir. 1995). Corroboration is a step toward establishing reliability. *United States v. Linnear*, 40 F.3d 215, 219 (7th Cir. 1994). A loss estimate based on hearsay may be allowed only if the hearsay is reliable. *United States v. Sliman*, 449 F.3d 797 (7th Cir. 2006); *United States v. Patrick*, 479 F.3d 760 (11th Cir. 2007) (rejecting estimate of loss based on tax liability unrelated to embezzlement).

Here, there is little to no corroboration in the form of accurate documentation for the inconsistent infringement amounts submitted by the Microsoft Corporation and the government, and consequently we are left with a gaping hole in reliability. Mr. Gu has a constitutional right to be sentenced on the basis of accurate information. *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008); *United States v. Townsend*, 73 F.3d 747, 751 (7th Cir. 1996). Evidence lacking sufficient indicia of reliability to support its probable accuracy must be rejected. *United States v. Are*, 590 F.3d 499, 521 (7th Cir. 2009).

Finally, an alternate measure of loss that may be applicable is the gain to the defendant, which is a methodology to be employed when a loss amount cannot reasonably be determined. *Pu*, 814 F.3d at 825 (citing USSG §2B1.1, comment. (n. 3)). We respectfully submit that the gain to Mr. Gu, namely $35,000, should be the basis of the infringement amount. This approach is particularly appropriate here given the flaws revealed in the corporation's methodology and Mr. Gu's limited involvement in the scheme. We also respectfully submit that the Court should side with the methodology most favorable to Mr. Gu because the Rule of Lenity applies to provisions of the Sentencing Guidelines as well as to penal statutes. *United States v. Fuentes-Barahona*, 111 F.3d 651,

653 (9th Cir. 1997). Therefore, 4 levels should be added to the base offense level of 8 for a combined total of 12, reflecting the infringement amount attributable to Mr. Gu.

### B. Manufacture, Importation or Uploading

The offense involved the manufacture, importation or uploading of infringing items, and an increase of 2 levels is appropriate. §2B5.3(b)(3). Thus, the offense level is adjusted to 14.

### C. Departure Considerations

Importantly, the notes to the applicable guideline provision expressly provide for departure considerations where, among other things, "the offense level determined under this guideline substantially . . . overstates the seriousness of the offense[.]" USSG § 2B5.3, comment. (n. 5). Note 5 sets forth a non-exhaustive list of factors that the Court may consider in determining whether a departure may be warranted, including where "[t]he method used to calculate the infringement amount is based upon a formula or extrapolation that results in an estimated amount that may substantially exceed the actual pecuniary harm to the copyright or trademark owner." USSG § 2B5.3, comment. (n. 5C). We respectfully submit that this note in the commentary section has viability here, particularly if any aspect of the Microsoft Corporation's methodology is employed.

### D. Mitigating Role

Section 3B1.2 allows for a two-level decrease in the offense level based on a defendant's minor role in the offense. USSG § 3B1.2. We respectfully submit that, based on the agreed-to factual basis in the plea agreement, Mr. Gu should be allowed a 2 level reduction in the offense level for being a minor participant in the offense. The government even acknowledged that co-defendant Xu was "the more culpable of the two defendants" in this case. (PSR at 6, par. 15). Finally, the probation office agreed that Mr. Gu qualifies for a minor role reduction and reduced the offense level by 2.

(PSR at 10, par. 31). We respectfully submit that the facts stated in the plea agreement as well as the enormity of the financial gain to the co-defendant in comparison to Mr. Gu stand as powerful evidence that Mr. Gu had a minor role in the offense, and thus the offense level should be reduced by 2 levels to level 12.

### E. Acceptance of Responsibility

Finally, Mr. Gu not only pleaded guilty, but he also has expressed profound contrition for his offense conduct as reflected in his "Version of the Offense and Statement of Personal Responsibility." As a consequence, the offense level should be reduced 2 levels for acceptance of responsibility, USSG §3E1.1, and thus the offense level is adjusted to level 10.[4]

### F. Total Offense Level and Advisory Sentencing Range

Based on a total offense level of 10 and a criminal history category of I, the Sentencing Table reflects an advisory range of imprisonment from 6-12 months.

### II. Restitution

Likewise, it follows that the restitution amount is $35,000 or $626,510, depending on the Court's infringement amount determination and the arguments set forth below. The plea agreement provides in relevant part that, pursuant to 18 U.S.C. § 3663A, the Court must order the defendant and any jointly liable co-defendant to make full restitution to the Microsoft Corporation in an amount to be determined by the Court at sentencing. (Doc. 45 at 9). While restitution shall be due immediately, it is to be paid pursuant to a schedule to be set by the Court at sentencing. (*Id*.).

---

[4]There should be a 3 level reduction for acceptance of responsibility if the Court finds that the offense level is 16 or greater prior to applying the acceptance of responsibility provision.

The burden of proof is on the government to demonstrate by a preponderance of the evidence the amount of restitutionary relief sustained by a victim. 18 U.S.C. §§ 3663A(c)(1)(B), 3664(a), (e). Further, the U.S. Probation Office "must conduct an investigation and submit a report that contains sufficient information for the court to order restitution." Rule 32(c)(1)(B). The probation office must provide the court with "information sufficient for the court to exercise its discretion in fashioning a restitution order. The report shall include, to the extent practicable, a complete accounting of the losses to each victim . . . . If . . . other circumstances exist that make this requirement clearly impracticable, the probation officer shall so inform the court." 18 U.S.C. § 3664(a).

Clearly, given the unmanageable breadth of the materials provided, along with the flaws revealed therein, we respectfully submit that it is impracticable to expect the probation office to provide a complete accounting of the losses to the Microsoft Corporation. An order of restitution must be based on actual monetary losses suffered by actual victims. *See* 18 U.S.C. § 3664(e); 18 U.S.C. § 3663A(b)(1)(B); *United States v. Swanson*, 483 F.3d 509, 515 (7th Cir. 2007). For restitution purposes, § 3663A "implicitly requires that the restitution award be based on the amount of loss actually caused by the defendant's offense." *United States v. Rhodes*, 330 F.3d 949, 953 (7th Cir. 2003); 18 U.S.C. § 3663(a)(1)(B)(i)(I).

Further, the restitution award must be based on the loss caused by the defendant's offense of conviction. In *Hughey v. United States*, the Supreme Court held that the restitution statutes limit restitution to "the loss caused by the specific conduct that is the basis of the offense of conviction." 495 U.S. 411, 413 (1990). Restitution is not authorized for acts merely related to the offense of conviction, such as acts that are within "relevant conduct" principles under §1B1.3, but are outside the actual offense of conviction itself. If the acts for which restitution is sought are outside the

offense of conviction and cannot otherwise be tied to a scheme, pattern or conspiracy that is an element of the offense of conviction, then restitution is unavailable.

It has been demonstrated that the Microsoft Corporation has claimed "losses" that are not supported in fact or in law. If restitution is ordered in an amount suggested by the corporation, it would receive a windfall because it did not suffer an economic loss of the magnitude suggested, and surely it did not expect to gain an additional million or two million from the sale of the software. Restitution is loss-based, *United States v. Genova*, 333 F.3d 750, 751 (7th Cir. 2003), and here there has been no reliable showing of a pecuniary loss. As it has demonstrated no reliable proof of economic harm, it simply cannot be considered a compensable victim for purposes of the Mandatory Victim Restitution Act ("MVRA"). *See United States v. Randle*, 324 F.3d 550, 555 (7th Cir. 2003). The MVRA mandates that restitution only is available to "an identifiable victim . . . [who] has suffered . . . pecuniary loss." 18 U.S.C. §3663A(a)(1) and (c)(1)(B). The MVRA's purpose is "to make the victims whole." *United States v. Gordon*, 393 F.3d 1044, 1052 n.6 (9th Cir. 2004).

There are two statutory exceptions to mandatory restitution in § 3663A: "if (A) the number of identifiable victims is so large as to make restitution impracticable; or (B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden of the sentencing process." 18 U.S.C. § 3661A(c)(3).

We respectfully submit that the second of the exceptions is applicable here. There are complex issues of valuation here. The materials the corporation provided to the probation office are incomplete to say the least. Given these circumstances, and given the practical economic situation presented, namely, the gross disproportionality of the vast bulk of the proceeds of the crime to the

co-defendant, a nominal payment to include the gain to Mr. Gu, namely, $35,000, should be applied here for purposes of restitution. Fundamentally, it would be unfair and contrary to the ideals of justice to saddle Mr. Gu with a lifetime of debt that could never be paid in full, especially here where the fugitive co-defendant profited handsomely.

The most important principle is that restitution is intended to make the victim whole by compensating it for its losses. *See* 18 U.S.C. §§ 3663(a)(1)(B)(i)(I), 3663A(b), 3664(a); USSG §5E1.1(a). The Microsoft Corporation's all-inclusive loss claim is ill-founded. For example, in *United States v. Martin*, the total value of the items infringed was well over $1 million, but the restitution equaled only $395,000, which reflected the retail value multiplied by the rights-holder's profit margin. 64 Fed. Appx. 129 (10th Cir. 2003). This case illustrates that restitution is based on lost net profits, not on total retail price. *See United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006) ("Because the purpose of the MVRA is to compensate a victim for its losses, the appropriate measure in this commercial setting is lost net profit."); *United States v. Chalupnik*, 514 F.3d 748, 754-55 (8th Cir. 2008) (vacating restitution award for failure to prove any actual lost net profit). Here, there has been no evidence or information produced concerning the corporation's lost net profits, and consequently the raw date and claimed "loss" is inaccurate.

Finally, if more than one defendant has contributed to the loss of a victim, the court may make each defendant liabile for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant. 18 U.S.C. § 3664(h). The Seventh Circuit has observed that the apportionment determination is "left to the district court's discretion." *United States v. Moeser*, 758 F.3d 793, 799 (7th Cir. 2014). Based on the statute and case law, we respectfully submit that

restitution be apportioned and reflect Mr. Gu's limited temporal and actual involvement. Restitutionary relief to the corporation in the amount of $35,000 and against Mr. Gu is consistent with the law and is supported by the facts.

Such a result is fair and reasonable given the information's allegations, the agreed-to factual basis, and the undisputed facts relating to the co-defendant's complete control over every aspect of the business operations. It was the co-defendant who took and presently has possession of the hundreds of thousands of dollars the corporation claims it lost. Surely, it would be unfair to burden Mr. Gu with the vast amounts of money obtained by the co-defendant, and consequently a $35,000 restitution judgment entered against Mr. Gu is appropriate.

III. <u>Mr. Gu's Personal History and Characteristics</u>

Section 3553(a) identifies certain mandatory factors to be considered in determining a reasonable sentence, including the "history and characteristics" of the individual defendant. 18 U.S.C. § 3553(a)(1). There are a number of reasons why Mr. Gu's history and characteristics support imposition of a term of probation rather than institutional confinement. Given Mr. Gu's important fatherly responsibilities to his two daughters, wife, and their parents, his significant contributions to the community, and his unusual degree of expressions of remorse, it is respectfully submitted that a variance and reduced sentence is justified and is a reasonable penalty under all the facts and factors before this Honorable Court.

In 2010, Mr. Gu made the unfortunate choice to accept a part-time job offered by his life-long friend, co-defendant Xu. Mr. Gu had no prior juvenile adjudications and no adult criminal convictions. Indeed, he never has been arrested. (PSR at 11, pars. 40-45). At 41 year's old, Mr. Gu now stands before the Court with a misdemeanor conviction for his conduct in this case.

As set forth in the PSR, Mr. Gu was born and raised an only child in Nanchang, China. (PSR at 11, par. 47). Raised in a communist society, Mr. Gu and his parents lived a middle class existence, surviving on around $7.00 per month, which covered most expenses as the government provided housing. Mr. Gu was an academically-oriented child. (PSR at 12, pars. 48-49). With no siblings, Mr. Gu played with his school and neighborhood friends, and, in particular, formed a close relationship with co-defendant Xu. (PSR at 12, par. 49). Mr. Gu felt "close as brothers" to co-defendant Xu. (PSR at 12, par. 49). As Mr. Gu explained, "Jun Xu was my closest childhood friend in China. As I did not have any siblings, he was like a brother to me. I met him in elementary school when I was 6 or 7 year's old. We studied together and played together. We grew up together and maintained daily contact through high school." (Mr. Gu's Version at 1).[5]

While in high school, Mr. Gu played on the school's soccer team and was selected to compete in a national math competition, among other things. (PSR at 12, par. 50). Following high school, Mr. Gu attended a local university, namely, Nanchang University, while co-defendant Xu attended a prestigious national university. (PSR at 12, 16, pars. 50, 68). Mr. Gu frequently visited and stayed in close contact with Xu through their college years. (Mr. Gu's Version at 1). Mr. Gu graduated from Nanchang University in 1997 with a bachelor's degree of science in applied physics. (PSR at 16, par. 68).

In 1999, Mr. Gu relocated to the United States in order to pursue a graduate degree. (PSR at 12-13, pars. 50-51). About a year later, co-defendant Xu came to the United States to further his education. After maintaining contact for several months, Mr. Gu reported that "Xu stopped

[5]"Ke Gu's Version of the Offense and Statement of Personal Responsibility" is attached to the PSR.

communicating with me completely. I felt like I lost a brother." Mr. Gu would not hear from Xu for some nine years when Xu reappeared and recruited Mr. Gu into his pre-existing scheme. (Mr. Gu's Version at 1-2).[6]

Mr. Gu graduated from Miami University in Oxford, Ohio, where he attained two masters degrees. (PSR at 13, par. 51). Specifically, he received a master's degree in systems analysis in 2001, and a master's degree in business administration in 2004. (PSR at 16, par. 68).

In 2001, Mr. Gu met Qiujing Song at a Bible study group. (PSR at 13, par. 52). They began dating and, in 2002, the two were married. (PSR at 13, par. 52). Mr. Gu and his wife have two daughters; one is 14 year's old and the other is 12. (PSR at 13, par. 53). As the probation officer noted in her report, Mr. Gu "spends a great deal of time with his daughters and enjoys performing various activities with them." (PSR at 13, par. 53). The Gu children "enjoy drawing, skating, ballet, gymnastics, piano, and violin." (PSR at 13, par. 53).

In 2009, Mr. Gu was baptized and became a Christian. (PSR at 13, par. 54). This was a significant step in his life because, while living in a communist society in China, the government did not permit such religious observance and devotion. (PSR at 13, par. 54). As reflected in the PSR, Mr. Gu is "heavily involved in his church, and is a small group leader." (PSR at 13, par. 54). Mr. Gu and his wife serve dinners and introduce people to Christianity, and Mr. Gu attends gospel camp on an annual basis. (PSR at 13, par. 54).

Mr. Gu, as the probation officer noted, "spends most of his free time with his family or at church." (PSR at 13, par. 55). These matters are confirmed by the character letters and letters in

_____

[6]Further facts surrounding Xu's solicitation and scheme are discussed in the next section of this memorandum.

support provided to the Court.[7] For example, Reverend Gary Hua, the Interim Senior Pastor at Living Water Evangelical Church in Naperville, Illinois, submitted a character letter to the Court on Mr. Gu's behalf. Reverend Hua advised the Court that the congregation consists of more than 480 members, and that Mr. Gu not only is a faithful member of the church, but also "has volunteered at so many activities" at the church. Mr. Gu "faithfully attends not only Sunday worships, but also Friday fellowships and Wednesday night prayer meetings. He is among our most promising fellowship leaders." (Rev. Hua letter).

Assistant Pastor Hui-Li Chang and Dr. Paul Chow also submitted a letter to the Court. They wrote:

> Mr. and Mrs. Gu are faithful servants in our church. Both have served as teachers in our Sunday school ministry. Mr. Gu faithfully taught either 2nd or 3rd grade, a season each year for the past 5 years. . . . Mr. Gu has been an exemplary teacher, serving dependably, responsibly and graciously. During his teaching, Mr. Gu always came on time fully prepared and handled himself very well with co-workers as well as with the children. He teaches the children very well. The children respect Mr. Gu and he has a kindness about him as he interacts with the students.
>
> Mr. Gu's dedication was also shown by never being late or missing any ministry meetings. His attendance provided tremendous support to the leaders. Mr. Gu also contributed significantly with excellent helpful suggestions about improving the teaching ministry, even during quarters when he is not teaching. This shows his commitment and concern for the spiritual growth of all our children. (Rev. Chang and Dr. Chow letter).

Mr. Gu is a leader in a Bible study group as well as a leader in the church, according to Mei Du. He even opens his home so that others may share in Bible studies. He also teaches Sunday school at the church, helps in the church kitchen during lunch after worship, and attends and has served as group leader at an annual Gospel camp every year. (Du letter).

---

[7]Thirteen character letters and letters in support were delivered to the probation office and the government, and the probation office thereafter forwarded copies of the letters to the Court.

Mr. Gu helps those in need. He helps people fix their cars, gives the elderly rides when needed, checks on and helps a widower, and opens his home to a number of seniors visiting the country. (Wang letter). Mr. Gu helped a brother who had fallen and hit his head while at the church. With Zheliang Wang, he took the man to the emergency room at the hospital and would not leave the man's side until doctors settled the injured man down. (Wang letter).

Whenever there is an activity at the church, Mr. Gu and his wife generously bring food so that everyone may eat. (Zhaosheng Gao letter). Mr. Gu also provides care for children in his neighborhood. He is concerned about their well-being and assists others with child care and transportation needs. (Barry and Deanne Dauber letter). Perhaps not surprisingly, as for his future goals, Mr. Gu hopes "to become involved with missionary work." (PSR at 13, par. 55).

Finally, Mr. Gu truly is remorseful for his actions and apologizes to the Court, the United States, the Microsoft Corporation, the co-defendant's customers, and his family and church for engaging in the copyright infringement conduct. As expressed in his letter to the Court:

> I respectfully and humbly ask Your Honor and the government to accept my deepest and sincerest apologies for the crime I committed. I ask the Microsoft Corporation and the customers to forgive me. I truly want everyone to know that I beg your forgiveness for the harm that was caused. I pledge to put behind me these unlawful ways and move forward in my life in a positive direction, avoiding at all costs any future involvement in any illegal activity. I ask my family and, most importantly, my wife and daughters to forgive me. I ask my brothers and sisters at the Living Water Evangelical Church in Naperville to accept my contrition. I deeply regret ever having been involved with Jun Xu and I carry a heavy guilt because of my weakness. (Mr. Gu's Version at 4-5).

Importantly, when confronted by federal agents about his offense conduct, Mr. Gu immediately ceased all dealings with the co-defendant's business and all contacts with Jun Xu. Further, rather than hide his negative conduct from others, Mr. Gu told the people in his church what

he had done. He took this action both for his own expiation as well as to use it as a lesson for others. Indeed, in his letter to the Court, Mr. Gu stated:

> Even though I am not proud of what I did, I have, and will continue to speak to others about avoiding getting involved in this type of computer software crime. I have been sharing my story – a story about my failure – among the brothers and sisters at my church. If they can take my lesson and learn from it, then I have succeeded. (Mr. Gu's Version at 5).

Certain of the letters tendered to the Court reflect Mr. Gu's atonement and revelation to the church. For example, Reverend Hua informed the Court that Mr. Gu admitted his misdeeds and that he "has a contrite heart and repented." (Rev. Hua letter). Assistant Pastor Chang and Dr. Chow also informed the Court that in their "prayer meetings, Mr. Gu has expressed a genuine remorse and contrition." (Rev. Chang and Dr. Chow letter). Hang Chang, a member of the church who also knows Mr. Gu professionally, also submitted a letter to the Court in which he wrote: "In our private prayer time together, he has consistently exhibited a genuine sense of remorse for his actions and sincere regret for his wrongdoing." (Chang letter). Indeed, Mr. Gu has demonstrated an unusual degree of sincere remorse, and it has not just been presented through words.

Even with all these familial and charitable responsibilities, Mr. Gu provides for his family financially. He is employed full-time as a software developer for a trading company, earning approximately $132,000 annually with the prospect of receiving bonuses. (PSR at 17, par. 71). Mr. Gu is able and prepared to immediately pay $35,000, which reflects the ill-gotten proceeds provided to him from the co-defendant.

IV. <u>The Nature and Circumstances of Mr. Gu's Offense</u>

Of course, the Court is required to consider "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), as part of the determination of what constitutes a reasonable sentence. Mr.

Gu pleaded guilty to the one count superseding information which alleged that he and others did willfully for the purpose of private financial gain, infringe the copyrights of Microsoft Corporation computer software through reproduction and distribution by electronic and physical means, including the Internet and the U.S. Postal Service, in violation of 17 U.S.C. § 506(a)(1)(A) and 18 U.S.C. § 2319(b)(3). (Doc. 41).

Initially, it is important to recognize that Mr. Gu had an extremely limited involvement in the offense. It is undisputed that it was co-defendant Xu who handled every aspect of the business; it was co-defendant Xu who created, owned, managed and operated the websites that served as his online businesses for the distribution of the counterfeit products in the scheme. Years after the co-defendant established his criminal scheme, he solicited Mr. Gu to assist him in the ministerial task of manually copying and mailing discs to those customers who ordered physical discs of the products. Mr. Gu maintained this limited role for approximately one year. The co-defendant controlled all other aspects of the operations, including receiving profits, transmitting all direct electronic downloads to customers, and providing the customers with Microsoft Corporation product keys.

In August of 2010, after some nine years without contact, co-defendant Xu reappeared and contacted Mr. Gu. Xu apologized for his absence and told Mr. Gu that he was living in New York and that he had decided to return to China because his visa was about to expire. Xu stated that he wanted to bring his parents to the Chicagoland area so that they could visit with Mr. Gu and his family. As Mr. Gu explained, " Given our history together and deep friendship, I happily agreed to give them a tour of Chicago as well as on my own home in Naperville." (Mr. Gu Version at 2).

Co-defendant Xu and his parents stayed in expensive rooms at the Trump Tower. Xu wore fine clothes and told Mr. Gu he had become successful in selling Microsoft Corporation products in association with the corporation through his online stores. The families spent a great deal of time visiting together throughout the weekend, and Mr. Gu believed that his "lost friendship had been renewed and again was flourishing." (*Id.*).

Several days after their visit, Xu called Mr. Gu and asked him if he would be interested working for Xu part-time at PCDeal4U.com. Xu stated that he needed someone to handle the physical shipment of discs ordered by his customers as he was returning to China. Xu related that most of his customers were content with electronic downloads of programs directly from Xu's websites, but that some customers wanted their products copied to a DVD and mailed to them. Xu said he would pay Mr. Gu $2,000 to $3,000 per month to copy and mail discs, depending on the number of customers that requested discs. Xu told Mr. Gu that his business was legal and that he had been successfully running it for years. (*Id.*).

While Mr. Gu had doubts about the legality of the business, he nevertheless decided to help his old friend and make some money after doing some investigation and due diligence of Xu's business.[8] Thereafter, Xu provided Mr. Gu with all of the items needed to handle the tasks required, including providing computers, duplicating towers, printers, and shipping materials.

When one of Xu's customers wanted a DVD of the software, Xu would email Mr. Gu, tell him what to copy and where to send it. Mr. Gu then would make a copy of the ordered program, print the proper postage amount using Xu's Stamps.com account, and mail the disc to the customer. For

---

[8]Mr. Gu's version provides additional details of the deception the co-defendant used against him as well as the limited investigation and due diligence he performed about the business.

these services over an approximate one year period, that is, August 25, 2010 through October 26, 2011, the co-defendant paid Mr. Gu approximately $35,000. (*Id*. at 2-3). When federal agents confronted Mr. Gu about his illegal conduct on October 26, 2011, Mr. Gu immediately ceased all contacts and dealings with Xu and his business. (*Id*. at 4).

V. <u>A Downward Variance or Departure Produces a Reasonable Sentence</u>

Mr. Gu respectfully seeks a downward variance such that a sentence with no custodial component is effectuated. In that light, it is respectfully submitted that the Court should consider and grant a non-guideline sentence of probation either under the factors promulgated in 18 U.S.C. § 3553(a) or as a traditional downward departure. A variance is appropriate here because any extended custodial sentence, given all of the circumstances, is unreasonable and greater than necessary. *See Kimbrough v. United States*, 552 U.S. 85 (2007).

Initially, Mr. Gu respectfully requests the Court to consider the complete absence of any type of criminal history in his background and the fact that he did not set out to engage in criminal conduct in this instance, but only deviated from his otherwise law-abiding ways when his trusted friend presented an opportunity to work part-time in his claimed legal venture. As reflected in the character letters submitted to the Court, Mr. Gu's actions in this case run contrary to his character, reputation and standing in the community.

For instance, Reverend Hua described Mr. Gu as "honest, trusted and respected," a man of "integrity and character," who is "always eager to help those in need." (Rev. Hua letter). Assistant Pastor Chang and Dr. Chow described Mr. Gu as being "very responsible, dependable and dedicated. He cares deeply about bringing the children and their families to know God." They indicated as well

their "great respect for his integrity" and "complete trust in his upright character." (Rev. Chang and Dr. Chow letter).

Jianrong Chen and Wei Zhou, worship deacon and church secretary, respectively, described Mr. Gu as an "honest, reliable, and trustworthy person." They further described Mr. Gu as a "humble man," who is "caring for other people's needs." They informed the Court that "Ke is happy and eager to help people and for many times when there was not enough manpower we found his helping hands were always there." (Chen and Zhou letter). Joe Wang advised the Court about his personal discipleship training with Mr. Gu and their countless personal moments together. He described Mr. Gu as an "exceptionally sweet, kind and thoughtful person," and as a "sincere selflessness person with a loving heart." (Wang letter). Similarly, Mei Du works and serves with Mr. Gu in the church, and she described Mr. Gu as "helpful, caring, responsible, trustworthy and his spiritual life grows each day." (Du letter). A brother in the church, Zheliang Wang, asked the Court to know that he would testify that Mr. Gu is "a very honest gentleman." (Wang letter).

Mr. Gu also is highly regarded within his neighborhood. Barry and Deanne Dauber, neighbors of the Gu family in Naperville, mentioned how their daughters became friends with the Gu children, and that is how they came to know Mr. Gu. They described Mr. Gu as an "open and honest man," and stated how they enjoyed long and thoughtful conversations with Mr. Gu about the differences between their cultures and religions. In their letter they advised the Court:

> We are confident that he is a man of genuine character who has a positive influence on his own family as well as our own daughter. Ke has proven himself to be an upstanding member of our community and very reliable. We regularly see him at school events in support of his children and the entire classroom. . . . Judge Darrah, we believe our community is [a] better place because of Ke Gu's contributions. (Dauber letter).

Mr. Gu also is spoken of highly in an employment setting. Yang Qian, a co-worker of Mr. Gu, informed the Court that Mr. Gu is "an honest and trustworthy colleague" with a "humble heart." He further described Mr. Gu as any one of us would hope to be described, namely, as "a family man, a kind husband and a loving father." (Qian letter). Likewise, Hang Chang knows Mr. Gu in a professional sense as well as from the church, and he informed the Court that Mr. Gu "is a man with a reputation for honesty and upstanding character. He pours copious amounts of time and attention into all his endeavors and is always willing to help those in need." (Chang letter).

Further, the PSR and the character letters create a loving portrait of the relationship Mr. Gu has with his two daughters, his wife and their parents, all of whom rely on Mr. Gu financially and in other aspects of their lives. Zewei Tong stated: "Ke is a devoted, caring and loving husband and father. His gentle smile to his two lovely daughters is a model for me as I strive to maintain [a] good relationship with my two teenage boys." (Tong letter). Further, Joe Wang related: "No matter how busy he is, [Mr. Gu] always has time for his daughters. He teaches his daughters Sunday school class. The lovely smile of a father with two chatting girls has become the icon in our church." (Wang letter).

Both daughters have gone through the children's ministry at the church and have now progressed to the youth ministry. (Rev. Chang and Dr. Chow letter). Hang Chang also addressed Mr. Gu's relationship and responsibility to his family. "The Gu family in Naperville is an exemplary one of three generations under one roof. It is a living inspiration to the Chinese-American community around." (Chang letter).

Mr. Gu's wife, Qiujing Song, also has submitted a letter to the Court in support of her husband. Ms. Song wrote that Mr. Gu "not only supports our family financially, but also contributes

to spiritual, physical and mental well-being of our family." She described how Mr. Gu not only holds down a full-time job, but also participates in volunteer work, church and school activities with their daughters as well as "taking care of house work and spending lots of time with our two daughters." (Song letter).

Ms. Song also described how close her family is in relation to religion and the importance of Mr. Gu's presence in the family. "Every Sunday night, we have family altar at home. Ke will lead us in praying and discussing what we have learned from the day's message, not only as a knowledge, but more importantly, how to apply [that] knowledge to our daily life. The whole family has become more God centered because of Ke's spiritual leadership." (Song letter).

Mr. Gu's parents, Gu Zhiqiang and Cao Jielian, similarly submitted a letter to the Court on behalf of their son. They described their son as being "always kind hearted and good natured." They described as well their dependence on Mr. Gu:

> Ke is a very good son to us, and a responsible family man to his wife and children. Knowing that we were becoming elderly and deteriorating in health (coronary heart disease for father, cerebral infraction for mother), he was determined to take care of us in our old age and invited us to live with his family in the United States a few years ago.

They further related how they are dependent on their son for financial reasons as well as for the spiritual support Mr. Gu provides them. (Gu Zhiqiang and Cao Jielian letter).

The probation officer described the strong bonds that form and support Mr. Gu's relationships with all of the family members. (PSR at 14, par. 56). Mr. Gu is recognized as a good father who spends a great deal of time raising his daughters. He is further described as "responsible, generous, and helpful," who is very involved in the church. Ms. Song reported to the officer how very difficult it would be for her, their daughters, and the parents if Mr. Gu was incarcerated. (*Id.*).

Mr. Gu is a primary care provider to his daughters and his parents. Imprisoning Mr. Gu would create substantial hardship for these family members, given the present circumstances and the fact that other reliable family members are unavailable to provide constant help. A probationary sentence would allow Mr. Gu to maintain his central support role on which the young children and his parents depend.

The children especially are squarely placed in a position of vulnerability at the notion of incarceration. If incarcerated, Mr. Gu will lose the ability to give his daughters the guidance they need. In terms of the penalties Mr. Gu could suffer as a consequence of his criminal conduct, the loss of seeing his daughters, providing for his daughters, and guiding and raising them must rank as the highest penalty imaginable to Mr. Gu.

The Supreme Court and the Seventh Circuit have acknowledged that significant childcare responsibilities may provide a legitimate basis for imposing a below-guidelines, non-incarceration sentence under § 3553(a)(1) and (2). *See Gall v. United States*, 552 U.S. 38, 59 (2007) (noting government's acknowledgment during oral argument that compelling family circumstances render a reduction from incarceration to probation appropriate); *United States v. Ross*, 501 F.3d 851, 854 (7th Cir. 2007) (holding district court is free to sentence below the guideline range based on the defendant's personal characteristics alone, including family circumstances); *see also United States v. Gary*, 613 F.3d 706, 711 (7th Cir. 2010); *United States v. Diekemper*, 604 F.3d 345, 355 (7th Cir. 2010); *United States v. Schroeder*, 536 F.3d 746, 755 (7th Cir. 2008); and *United States v. Cruz-Guevara*, 209 F.3d 644, 648 (7th Cir. 2000).

Combined with the other factors identified herein, a term of probation should be imposed given the essential and irreplaceable role Mr. Gu has to his daughters as the primary caretaker and

provider. Mr. Gu's absence from their lives would have a seriously detrimental effect on the children. If confinement is imposed, it would mean a substantial, direct and specific loss of essential parental guidance and financial support. Mr. Gu's devotion to, and responsibilities to his daughters stand in stark contrast to his own childhood experience and sets him apart from other defendants.

Additionally, Mr. Gu's volunteer work and charitable work as well as other good deeds performed by him may serve as a basis for a variance or departure. *See United States v. Wilke*, 156 F.3d 749, 754 (7th Cir. 1998) (sentencing court may depart for extraordinary charitable work and prior good deeds); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (combination of defendant's civic good deeds and physical condition warranted a departure). Clearly, the PSR and the character letters provide ample proof of Mr. Gu's volunteer work and charitable work as well as other good deeds performed by him for the benefit of others.

Finally, Mr. Gu has done more than simply voice contrition for his offense conduct. He has made good on his word to use his experience as a lesson for others. We respectfully ask the Court to consider Mr. Gu's sincere expressions of remorse coupled with his efforts to educate others against the pitfalls of copyright infringement. The Seventh Circuit has stated that "[s]ubstantial and reliable evidence of genuine [post-offense] rehabilitation" is an appropriate ground for a non-guidelines sentence under § 3553(a)(2)(B), (C), and (D). *United States v. Robertson*, 662 F.3d 871, 880 (7th Cir. 2011). The reason is two-fold. First, the "successful rehabilitation of a criminal . . . is a valuable achievement of the criminal process." *United States v. Core*, 125 F.3d 74, 78 (2d Cir. 1997). Second, a rehabilitated defendant "is less likely to re-offend, thus a reduced sentence for such an offender will serve the purposes of specific deterrence and protection of the public." *United States v. Rutherford*, 323 F.Supp.2d 911, 915 (E.D. Wis. 2004). It is respectfully submitted that Mr. Gu's

recent past actions display strong evidence of self-motivated rehabilitation, which supports imposition of an alternative to traditional institutional confinement. *See United States v. Ngatia*, 477 F.3d 496, 501 (7th Cir. 2007) (defendant's shame, rehabilitative efforts, and good character justified a departure of over 100 months from the low-end of the otherwise applicable sentencing range).

Mr. Gu's characteristics and personal history as well as his present responsibilities and circumstances – considered individually or in a combined fashion – are simply beyond the norm and there is no compelling reason to remove him from his daughters, wife, parents and society. Pursuant to the factors stated in § 3553(a), a non-guideline sentence would appropriately recognize the facts of the offense, the characteristics of the offender, and the need to "impose a sentence sufficient, but not greater than necessary," to accomplish the sentencing and societal goals of punishment, deterrence, rehabilitation, and a return to productive citizenship. 18 U.S.C. § 3553(a). Mr. Gu's family responsibilities as well as his charitable service and record of prior good deeds all are relevant in determining whether a variance or departure is warranted. *Id*. The nature of these considerations clearly demonstrate that a non-guideline sentence is fair and reasonable under traditional departure principles or as part of a § 3553(a) analysis. *See Gall*, 552 U.S. at 50.

In the over five years since Mr. Gu's offense conduct ended, he has fully recommitted to a law-abiding lifestyle by dedicating himself to his family and church, working steadily, contributing to the community, cooperating with the government, and complying with all pretrial obligations. Mr. Gu's exemplary conduct over the past several years demonstrates a proactive decision to reform, and thus proves that it is not "necessary" to imprison him in order to fulfill § 3553(a). *See Gall*, 552 U.S. at 59 ("Gall's self-motivated rehabilitation . . . lends strong support to the conclusion that imprisonment was not necessary to deter Gall from engaging in future criminal conduct or to protect

29

the public."). Mr. Gu has been on an unsecured personal recognizance bond without pretrial supervision since his arraignment. (PSR at 4, par. 5). The fact that the Court and the government saw fit to allow him to be on bond without an officer supervising him throughout the pretrial proceedings says a lot about the level of trust placed in Mr. Gu. Moreover, Mr. Gu did not let the Court or the government down in placing that level of trust in him as he has remained on bond without supervision for over two years, and has been in full compliance with all conditions of his release.

VI. <u>Conclusion</u>

In raising these factors in mitigation, Mr. Gu is not attempting to minimize the seriousness of his conduct. He is not seeking to avoid just punishment. Rather, he respectfully submits that the otherwise applicable punishment be modified to reflect the unusual circumstances present here. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 112 (1996). Wherefore, defendant Ke Gu respectfully requests this Honorable Court to impose a fair and reasonable sentence of probation.

Respectfully submitted,

s/ Francis C. Lipuma
Francis C. Lipuma
Counsel for Ke Gu

Francis C. Lipuma
300 South Wacker Drive
Suite 1700
Chicago, Illinois 60606
(312) 675-0089
franklipuma@gmail.com

CERTIFICATE OF SERVICE

I, Francis C. Lipuma, an attorney, do hereby certify that I caused a copy of "Defendant Ke Gu's Sentencing Memorandum" to be served upon:

| | |
|---|---|
| Peter S. Salib | Rebecca L. Fowlie |
| U.S. Attorney's Office | U.S. Probation Office |
| 219 South Dearborn Street | 230 South Dearborn Street |
| Chicago, IL 60604 | Chicago, IL 60604 |

pursuant to Fed.R.Crim.P. 49, L.R. 5.5, and the General Order on Electronic Case Filing of the United States District Court for the Northern District of Illinois, Eastern Division.

s/ Francis C. Lipuma
Francis C. Lipuma
300 South Wacker Drive
Suite 1700
Chicago, IL 60606
(312) 675-0089
franklipuma@gmail.com